UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
HOWARD KNOX,

                Plaintiff,

       - against -

PAROLE OFFICER I. KHAN and SENIOR PAROLE
OFFICER K. UZZELL,

                Defendants.
--------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-1281 (RRM) (CLP)

ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Howard Knox brings this action for false arrest, malicious prosecution, failure to

intervene, and individual supervisory liability pursuant to 42 U.S.C. § 1983, in relation to

charges filed against him for alleged violations of supervised release. (Am. Compl. (Doc.

No. 19).) The charges alleged that Knox committed domestic violence and violated his curfew,

neither of which were sustained at the resulting parole revocation hearing. (*Id*. ¶ 4.) Before the

Court is defendants' motion for summary judgment. (Mot. for Summ. J. (Doc. No. 40).) For the

reasons explained below, defendants' motion is granted.

## BACKGROUND

       The parties agree on the facts, except where otherwise noted. On November 25, 2011,

Knox was released to parole following incarceration for violations of New York Penal Law,

specifically Manslaughter in the First Degree and Criminal Use of Firearms in the First Degree.

(Conditions of Release, Ex. B to Uzzell Decl. (Doc. No. 43-2) at 2.) In relevant part, Knox was

subject to the following two conditions of release:

> I will not behave in such manner as to violate the provisions of any
> law to which I am subject which provide for a penalty of
> imprisonment, nor will my behavior threaten the safety or well-
> being of myself or others.

I will abide by a curfew established by the P.O.

(*Id.*) Knox was also subject to a standard condition requiring discussion with his parole officer of proposed changes to his residence or employment (or notice of such change where prior discussion is impossible), and to a special condition that he would "seek, obtain and maintain employment and/or an academic/vocational program." (*Id.*) On February 22, 2012, Knox acknowledged additional special conditions, including that he would "remain inside [his] approved residence from 9pm until 7am seven days a week," and that he would not leave New York City. (*Id.* at 3.)

Prior to the relevant time period, Knox was supervised by Parole Officer Yvonne Oliver, who reported to Senior Parole Officer Hubert Browne. (Uzzell Decl. (Doc. No. 43) ¶ 7; Kahn Decl. (Doc. No. 44) ¶ 5.) On November 14, 2013, Knox was transferred to the supervision of Parole Officer Iris Kahn, who reported to Senior Parole Officer Kevin Uzzell. (Uzzell Decl. ¶¶ 2, 4, 7; Kahn Decl. ¶¶ 2, 3, 5.) Kahn did not speak with Oliver about Knox at any point. (Kahn Dep., Ex. B to Campbell Decl. (Doc. No. 48) at 15.) However, Khan reviewed Knox's file, including the Parolee Chrono Report ("Chrono"), a log of his supervision history and modifications to his conditions of release. (Kahn Dep. at 15; Uzzell Decl. ¶ 7; Kahn Decl. ¶ 7.) According to Uzzell, "accurate and truthful" Chrono entries should be made "as close in time to the event as possible because . . . supervisors and colleagues rely on the information . . . in making decisions about the supervision of parolees." (Uzzell Decl. ¶ 7.) Uzzell and Kahn both relied on the accuracy of the entries, and stated that they "had no reason to believe otherwise." (Uzzell Decl. ¶ 7; Kahn Decl. ¶ 7.) Kahn acknowledged, however, that not every event is documented in the Chrono. (Kahn Dep. at 17.)

On November 14, 2013, Uzzell reviewed Chrono entries made by Oliver and Queens I Area Bureau Chief Alan Preston, dated August 17, 2013, August 19, 2013, and August 28, 2013. (Uzzell Decl. ¶¶ 7–8.) He also directed Kahn's attention to these entries. (Kahn Decl. ¶ 8.) The Chrono entries showed that on August 17, 2013, Bureau Chief Preston received a call from a woman identifying herself as Lola Zanzibar,[1] who said she was an ex-girlfriend of Knox's, and who had a phone number ending in -1212. (Chrono, Ex. C to Uzzell Decl. (Doc. No. 43-3) at 8.) Zanzibar stated that she had received "disturbing calls" from Knox in the past, threatening to harm and kill her. (Id.) She had ignored these threats, but recently received a call from a woman who identified herself as Knox's current girlfriend and said she was beat up by Knox in June 2013. (Id.) Preston told Zanzibar that this information would be shared with other parole officers for follow-up action, and Zanzibar expressed concern that if Knox found out that she called, he would harm her, or have others harm her. (Id.)

According to the Chrono, on August 19, 2013, two days after this call was received, a case conference was held. (Id. at 5.) The corresponding Chrono entry reads, "Investigate by calling victim getting more details." (Id.) Oliver called Zanzibar after the conference, and Zanzibar referenced the previously discussed claims, stating that Knox had threatened her "many times," and that his current girlfriend said that he was "physically abusive" toward her. (Id.) Zanzibar also shared additional allegations of domestic violence, including that Knox told her and his current girlfriend, separately, that he had people following them. (Id.) Zanzibar stated that her neighbors had told her that Knox stands outside her home for hours waiting for her. (Id.) Oliver advised Zanzibar that parole was required to act on the information. (Id.) She

---

[1] Various points in the Chrono refer to this individual's last name as "Zanzibar," "Zan Ibar," and "Ibar." Oliver explains that "Ibar" resulted from her misreading of Preston's Chrono entry. (Oliver Decl. (Doc. No. 45) ¶ 7.) For the purpose of clarity and consistency, the Court uses Zanzibar.

encouraged Zanzibar to take Knox's threats "very seriously," to file an order of protection, and to visit the office to show the officers Knox's calls and text messages. (*Id.*) Zanzibar stated that she was "very afraid," and again expressed concern that Knox would find out that she complained. (*Id.*)

Within the hour, the officers held another case conference; the corresponding Chrono entry reads, "Have victim come in to give statement." (*Id.* at 5.) However, when Oliver called Zanzibar again, she said she was not sure if she would come into the office. (*Id.*) Oliver advised that even if Zanzibar did not come in, parole would need to place additional conditions on Knox's parole, including a stricter curfew, and prohibitions on travel and any contact with Zanzibar. (*Id.*)

On August 28, 2013, Knox reported to the parole office. (*Id.*) Knox stated that he was not working, but he was taking night classes. (*Id.*) He also told Oliver that his girlfriend's name was Lola Agustus, and provided her address and phone number. (*Id.*) Agustus had the same phone number, ending in -1212, as the woman who identified herself as Lola Zanzibar. (*Id.*)

Nevertheless, Oliver and Browne made no attempt to visit Knox's girlfriend. (Uzzell Dep., Ex. A to Campbell Decl. at 7–8.) Indeed, following Knox's appearance at the parole office on August 28, there are no Chrono entries for one month. The next entry, dated September 30, 2013, was written by Browne and states only, "Test for illegal substances; make HV; encourage the payment of fees. Continue to supervise as per the conditions of release." (Chrono at 4.) This is Browne's last entry before Uzzell and Kahn assumed supervision of Knox.

Uzzell and Kahn made the connection that Agustus had the same phone number as Zanzibar. (Uzzell Decl. ¶ 12; Kahn Decl. ¶ 10.) [2] Uzzell believed Zanzibar and Agustus were

---

[2] Kahn's declaration suggests that she made this connection when she reviewed the Chrono on November 14, 2013, before a warrant was requested, rather than afterward. (Kahn Decl. ¶ 10.)

the same woman.  (Uzzell Decl. ¶ 12; Chrono at 4.)  Uzzell also believed that Oliver and Browne "didn't really investigate [the allegations] thoroughly"; "they didn't do what they should have done for the case."  (Uzzell Dep. at 4.)  Uzzell had a conversation with an unidentified colleague,[3] who expressed his viewpoint that, "if we couldn't get the victim to come in and give us a letter saying none of this ever happened, we would have to take [Knox] into custody."  (*Id.*) According to Uzzell, the colleague shared the sentiment that their "peers dropped the ball," and agreed that they "should have issued a warrant[.]"  (*Id.* at 5.)  Uzzell testified that he "wanted to interview [Zanzibar] initially[,] and absent her coming in and saying it didn't happen," he wanted to arrest Knox.  (*Id.* at 6.)  He felt that "this woman was in fear for her life and she was talking about herself in the third person because she was scared of this guy and what he was capable of." (*Id.*)  In Uzzell's experience, which includes 20 years of service with parole and time spent as a "sex offender supervisor," victims often use fictitious names when reporting domestic violence, "especially if they are afraid of the consequences of the subject finding out that they have made a complaint."  (Uzzell Dep. at 8; Uzzell Decl. ¶ 13.)  Kahn also noted that in her experience, "it was not uncommon for domestic violence complainants to withdraw their complaints or refuse to cooperate," or "to change his or her mind about whether or not to cooperate."  (Kahn Decl. ¶ 22.)

The subsequent Chrono entry, dated November 14, 2013, is the first entered by Uzzell, and states, "Subject to be taken into custody in light of DV related threats interview vic ASAP prepare supeona [sic] if necessary."  (Chrono at 4.)  That same day, in the afternoon, another entry by Uzzell states, "Warrant requested for DV related threats to female victim."  (*Id.*)  Uzzell confirms that he met with his supervisor, Queens II Bureau Chief Mark Parker, to discuss

---

[3] Based on the totality of the record, this is likely Bureau Chief Mark Parker, but it is not entirely clear.  (*See, e.g.*, Uzzell Dep. at 12–13.)

Knox's case that day, and he requested the warrant based on the domestic violence allegations. (Uzzell Decl. ¶ 14.)

One week later, on November 21, 2013, Kahn conducted a home visit in the morning to introduce herself to Knox as his new parole officer. (Chrono at 4.) She entered a note in the Chrono describing that visit. (*Id.*) At Kahn's deposition, she testified that she arrived at Knox's residence at 6:59 AM, but she did not note this in the Chrono. (Kahn Dep. at 17.) When she arrived, there was no answer at the door. (Chrono at 4.) According to the Chrono, Kahn called the phone number listed as Knox's home number, and Knox's father answered. (*Id.*) When Kahn asked to speak with Knox, his father stated that Knox was with his mother in Mount Vernon, and that Oliver was aware that Knox went there on the weekends. (*Id.*) When Kahn observed that it was Thursday, Knox's father said it was an emergency, that he was "taking [his] parents to a funeral," and that Knox had a "special understanding" with Oliver and "doesn't call her every 5 min." (*Id.*)[4] Nevertheless, the Chrono is devoid of any indication that a "special understanding" existed; the Chrono indicates that Knox was allowed to visit his mother on weekends, but that he was required to call Oliver if he needed to "stay[] out during the week." (Chrono at 6.)

A few minutes later, Knox returned Kahn's call, and complained that Kahn had contacted his elderly father, stating that she should only call Knox's cell. (Chrono at 4.) The Chrono notes that Knox was "annoyed that [Kahn] was giving him a hard time and being mean." (*Id.*) Knox was not aware that Kahn was assigned to him until she called him that day. (Knox Dep. (Doc. No. 42-1) at 5.) This was routinely how Knox found out about new parole officers, and he had

---

[4] Kahn's declaration varies slightly from her Chrono entry. She declares that when no one answered the door at Knox's residence, she called Knox's phone number. (Kahn Decl. ¶ 14.) No conversation with Knox's father is mentioned in her declaration. The substance of the conversation she describes is the same, but she describes it as occurring with Knox rather than his father.

not received any written notice of the change.  (*Id*. at 7.)  Knox was instructed to report to the parole office the following week.  (Chrono at 4.)

It is undisputed that Knox did go to his mother's residence on November 21, 2013, and that he arrived before 7:00 AM.  (Knox Dep. at 3.)  In his declaration, Knox states that on that day, he "had to report to Mount Vernon for work by 7:00 AM," and that he left his residence around 6:00 AM.  (Knox Decl. ¶ 11.)  Knox estimates that he was at his mother's house for approximately ten minutes before leaving for work.  (Knox Dep. at 4.)  Knox's employer verifies that he was scheduled to report to work on November 21, 2013, that Knox "is always very punctual," and that the start time for all employees is 7:00 AM.  (Davis Decl. (Doc. No. 50) ¶¶ 2–4.)[5]  Knox states that his parole "officers have always allowed [him] to leave . . . home prior to the 7:00 AM curfew to comply with the start of the work day."  (Knox Decl. ¶ 5.)  However, the Chrono does not reflect this alleged arrangement.[6]

Knox states that he spoke with Kahn around 7:00 AM that morning.  (Knox Decl. ¶ 13.)  He recalls that Kahn asked him where he was, and he told her either that he was at work or at his mother's house.  (Knox Dep. at 6.)  Knox asked if Kahn had read his file, and stated that had she done so, she would know that he could visit his mother at her house.  (*Id*.)  Knox testified that Kahn told him she had not read the file or anything else, and she did not know whether he had permission to be there.  (*Id*. at 6–7.)

---

[5] Knox's employer, Keith Davis of Davis Electrical Services, Inc., declares that Knox has been employed part-time, "on an as needed basis," since January 14, 2013.  (Davis Decl. ¶ 2.)

[6] The closest indication that Knox ever had such accommodations at any time is dated August 29, 2012, indicating that Knox "must be to work by 6AM" for his job with a different employer, Danella Construction Corporation ("Danella").  (Pl. Chrono, Ex. E to Campbell Decl. at 33.)  Even if the Court were to infer that this note implies that Knox had permission to break his curfew condition for work in August 2012, Knox does not contend, and the evidence does not suggest, that his job at Danella was related to the job he had with Davis Electrical Services, Inc. at the time in question.  The Chrono suggests that his employment with Danella ended in February 2013.  (Chrono at 6.)

Although Knox claimed at his deposition that he had permission to be in Mount Vernon that day for work, the Chrono indicates otherwise. The Chrono states that on July 2, 2013, during Oliver's first home visit, Oliver directed Knox to "consult with [her]" if he needed to go to Mount Vernon on a weekday. (Chrono at 6.) The Chrono also states that a case conference was held on July 2, 2013, during which Browne and Oliver confirmed that Knox was required to call Oliver if he needed to "stay[] out during the week." (*Id.*) Oliver's last Chrono report for Knox, dated August 28, 2013, notes that Knox was not employed. (*Id.* at 5.) Kahn did not speak with Oliver to verify whether or not Knox had any oral agreement with her. (Kahn Dep. at 17.) Kahn declares that she was not aware of any special understanding, or any accommodation to Knox's curfew or travel conditions other than what was noted in the Chrono. (Kahn Decl. ¶¶ 15, 18.)

Later that day, on November 21, 2013, Uzzell entered a note in the Chrono, stating, in relevant part, "In light of recent DV allegation . . . refer to DV program. Get statement from victim indicating her unwillingness to cooperate with any parole violation proceeding reach out to [sic] victim and encourage her to come in." (Chrono at 4.)[7] About an hour later, Kahn noted that she called Zanzibar and left a message requesting a return call. (*Id.* at 3.) One week later, Zanzibar had not returned Kahn's call.

On November 27, 2013, a technical warrant was issued for Knox's arrest. (Chrono at 3.) Officers Uzzell and Kahn signed the Violation of Release Report the same day, which listed two charges. (Violation of Release Report, Ex. D to Uzzell Decl. (Doc. No. 43-4).) First, "[o]n 11/21/13 at 6:59 AM at the location of [address omitted] the subject failed to comply with the special conditions given to him in writing that he comply with a curfew of 9pm to 7am 7 days a

---

[7] Uzzell's declaration states that he directed Kahn to interview Zanzibar as soon as possible and prepare a subpoena on November 14 rather than November 21. (Uzzell Decl. ¶ 14.)

week." (*Id.*) Second, "On or before 8/17/13 the subject violated . . . the conditions of his parole in that he threatened the safety and well being and Life of Lola Zanibar." (*Id.*) At this point, Uzzell had never spoken to or met with Knox, and he disavows any animus or malice toward Knox. (Uzzell Decl. ¶ 19.)

Knox reported to the parole office and was taken into custody that day. (Chrono at 3.) According to Knox, he was arrested by Kahn for allegedly threatening "Lola" in August 2013, but Khan did not specify a last name. (Knox Decl. ¶ 14.) He told Kahn that he had never threatened Lola in any way and "begged her to contact Lola Agustus to clear things up." (*Id.*) Kahn did not explain why the allegations were not addressed in August, and she said there was nothing she could do about it. (*Id.*) Knox states that he "pleaded with PO Kahn and SPO Uzzell to do something and they told me to straighten it out on Rikers Island." (*Id.*)

After his arrest, on November 27, 2013, Knox waived his preliminary hearing and signed the Notice of Violation. (Notice of Violation, Ex. E to Uzzell Decl. (Doc. No. 43-5); Chrono at 3.) He explains, "I knew I was not guilty and wanted to have the final determination as soon as possible to be released from custody." (Knox Decl. ¶ 15.)

On December 2, 2013, Kahn received a call from "Lola." (Chrono at 3.) Lola stated that she had been receiving calls and visits at her home from Knox's family, who had told her that Knox was in custody because of her complaint. (*Id.*) Lola then recanted; she denied making any complaint, said she was never threatened, and suggested to Kahn that someone else had called and provided her phone number by mistake. (*Id.*) Lola said she had only called parole to request that her address be removed from Knox's record. (*Id.*) According to Khan, Lola said she would not "sign[] anything," but this is not noted in the Chrono. (Kahn Dep. at 18.) A little over an

hour after that call, Kahn received a call from Knox's mother, who wanted to know why Knox was in custody "if the girl didn't want to press charges." (Chrono at 3.)

At no point did Kahn visit anyone to verify any allegations against Knox or the identity of the person who called. (Kahn Dep. at 21–22, 24.) Kahn could not remember if she told Uzzell about the December 2 calls, and she did not contact the Parole Violations Unit to advise them of the call. (*Id*. at 20.)

On December 4, 2013, Knox was declared delinquent. (Chrono at 2.) A final hearing occurred on December 10, 2013, and January 8, 2014. (*Id*.) On December 10, the revocation specialist was supplied "a letter from Lola who denied making any allegations." (Knox Decl. ¶ 16.) The specialist asked for time to investigate the letter, and the hearing was adjourned to January 8. (*Id*.) Neither Uzzell nor Kahn participated in Knox's revocation hearing. (Uzzell Decl. ¶ 17; Kahn Decl. ¶ 20.)

No violations were sustained. (Parole Revocation Decision Notice, Ex. F to Uzzell Decl. (Doc. No. 43-6) at 3.) The parole revocation specialist withdrew the domestic violence charge (Uzzell Decl. ¶ 17), and found that the "charge of violation of curfew by 1 minute" was "not a violation in [an] important respect." [8] (Parole Revocation Decision Notice at 3.) The warrant was lifted and cancelled, as was Knox's delinquency. (*Id*. at 4.) Knox was restored to supervision. (Chrono at 2.) On March 15, 2016, Knox initiated this civil rights action related to his detention and prosecution for the alleged violations of parole.

---

[8] New York parole regulations state that a warrant "may issue when there is reasonable cause to believe that the releasee has lapsed into criminal ways or company, or has violated the conditions of his release in an important respect." 9 N.Y.C.R.R. § 8004.2(c).

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases). In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 322). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough

evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I.     False Arrest

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  To make out a claim for false arrest, a plaintiff must show:  (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged.  *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (citation omitted).

The only element in dispute in this action is whether Knox's confinement was privileged. The existence of probable cause to arrest is "a complete defense" to claims for false arrest and malicious prosecution.  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (false arrest); *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (malicious prosecution).  An officer has probable cause to arrest when he has "reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Weyant*, 101 F.3d at 852.  When a parolee is involved, "the lower 'reasonable cause' standard" is applied.  *Gathers v. White*, No. 04-CV-5454 (JG), 2007 WL 446755, at *4 (E.D.N.Y. Feb. 8, 2007).  New York parole regulations explain:

> A warrant for retaking and temporary detention may issue when there is reasonable cause to believe that the releasee has lapsed into

> criminal ways or company, or has violated the conditions of his
> release in an important respect. Reasonable cause exists when
> evidence or information which appears reliable discloses facts or
> circumstances that would convince a person of ordinary
> intelligence, judgment and experience that it is reasonably likely that
> a releasee has committed the acts in question or has lapsed into
> criminal ways or company. Such apparently reliable evidence may
> include hearsay.

9 N.Y.C.R.R. § 8004.2(c).  Cause to arrest a plaintiff on even one charge defeats a claim for false

arrest.  *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[I]t is not relevant whether

probable cause existed with respect to each individual charge . . . .").  An action for false

imprisonment "redresses the violation of a plaintiff's freedom of movement," and thus, alleged

injuries are "associated with the detention itself, and not with the individual charges."  *Id.*

(internal quotation marks omitted) (citation omitted).  Courts focus on "the validity of the *arrest*,

and not on the validity of each charge."  *Id.* (emphasis in original).

   With respect to the alleged curfew violation, the evidence viewed in the light most

favorable to Knox would indicate that he was at his mother's residence in Mount Vernon at

approximately 7:00 AM on November 21, 2013.  (Knox Dep. at 3.)  He was operating under an

understanding he had with Oliver that he could leave his home before 7:00 AM in order to work

in Mount Vernon, and that morning, he had left around 6:00 AM.  (Knox Decl. ¶ 11.)  When

Knox and Kahn spoke on the phone, he stated that Kahn should review his file to see that he had

permission to leave early for work.  (Knox Dep. at 6.)  Unknown to Knox, the Chrono did not

reflect that he had any employment at the time, and it contained no mention of any exceptions

made for his work schedule.  It was noted only that Knox stayed with his mother on the

weekends, and that he had to consult with Oliver if he "stay[ed] out during the week."  (Chrono

at 6.)

On these facts, it is clear that Kahn had reasonable cause to believe that Knox violated his conditions of release. Knox evidently left his residence well before 7:00 AM on the morning in question, as he arrived in Mount Vernon by then. There was no notation in the Chrono that Knox had a job at the time or any accommodations to his curfew. There was, however, a notation that he was required to discuss weekday visits to his mother with his parole officer.

Although Knox told Kahn that he had an understanding with Oliver, Kahn was "not required to prove wrong" Knox's conflicting account before effectuating his arrest. *Panetta v. Crowley*, 460 F.3d 388, 398 (2d Cir. 2006) (finding that officer did not need to investigate further, where arrestee indicated that a phone call to another party "would clear her of wrongdoing" when officer otherwise had "reasonably trustworthy information" from a witness that aligned with the officer's own observations); *see also Ricciuiti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Coleman v. City of New York*, No. 03-CV-4921 (DLI) (LB), 2009 WL 705539, at *3 (E.D.N.Y. Mar. 16, 2009) (finding both probable cause for arrest and reasonable cause to find plaintiff had "lapsed into criminal ways" for purposes of parole when plaintiff appeared to be removing a car battery from another person's vehicle though plaintiff explained at the time that he was doing so at someone's request). Instead, Kahn could reasonably rely on the information that Knox himself provided – that he was in Mount Vernon at 7:00 AM that morning – and the information in the Chrono left by Oliver, indicating that Knox was required to consult with her before visiting his mother during the week. Furthermore, the nature of the violation could reasonably be considered important, as Knox had not only left sufficiently early to arrive in Mount Vernon by 7:00 AM (as he himself testified that he usually

14

left at 6:00 AM), but he was also outside his permissible travel area, specifically in contravention of a note that he was required to seek permission to travel to there.

No genuine issue of material fact exists with respect to Knox's arrest for an alleged violation of curfew. As reasonable cause existed for Khan and Uzzell to arrest Knox for this charge, the Court need not consider whether reasonable cause existed for the domestic violence charge. *See Jaegly*, 439 F.3d at 154 ("[P]laintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge . . . ."). Even if, assuming *arguendo*, the domestic violence allegations were insufficient on their own to support an arrest, this would "not negate the relevance" of the curfew charge "as sufficient independent grounds" for his detention. *Alvarado v. City of New York*, 482 F. Supp. 2d 332, 337 (S.D.N.Y. 2007).

### a. Qualified Immunity

Alternatively, at the very least, defendants are entitled to qualified immunity, which shields a government defendant from liability if his "action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks omitted) (citation omitted). In the context of a false arrest claim, an officer is entitled to qualified immunity if he had at least "arguable probable cause." *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017). Arguable probable cause exists when "officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted) (citation omitted). The Second Circuit has repeatedly emphasized that qualified immunity protects all but the "plainly incompetent and those who knowingly violate the law." *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, even assuming that Khan could not be sure whether Knox had a special understanding with Oliver regarding his curfew, it is undisputed that the Chrono indicated otherwise. On these facts, it is at least arguable that she and Uzzell had probable cause to seek the issuance of a warrant for Knox's arrest. The "circumstances that led to [plaintiff's] arrest cannot be said to be such that an objectively reasonable person would have known that they were violating [plaintiff's] rights." *Alvarado*, 482 F. Supp. 2d at 338. The ultimate outcome of the parole revocation hearing does not alter this analysis. *Taylor v. Sullivan*, 166 F.3d 1201, 1202 (2d Cir. 1998) (unpublished opinion) (quoting 9 N.Y.C.R.R. § 8004.2) ("[T]he fact that the charge . . . was dismissed for insufficiency following Taylor's parole revocation hearing is irrelevant because, at the time that Sullivan issued the violation report, she reasonably believed that Taylor was 'violat[ing] one or more of the conditions of his release in an important respect,' and she was, therefore, entitled to qualified immunity."). Thus, Knox's claim for false arrest fails on the grounds of qualified immunity, as well.

## II. Malicious Prosecution Claim Barred by Qualified Immunity

To state a malicious prosecution claim under § 1983, a plaintiff must allege a violation of his rights under the Fourth Amendment, as well as the "elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege facts that show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id*. (internal quotation marks omitted) (citation omitted); *see also Acevedo v. Ross*, No. 18-CV-06140 (JMA) (AKT), 2019 WL 343246, at *4 (E.D.N.Y. Jan. 28, 2019).

As with false arrest claims, "the existence of probable cause is a complete defense." *Savino*, 331 F.3d at 72 (citation omitted). When a parolee is involved, "the lower 'reasonable cause' standard" applies." *Gathers*, 2007 WL 446755, at *4. However, to defeat a malicious prosecution claim, defendants must have reasonable or probable cause for each offense charged. *Posr v. Dohery*, 944 F.2d 91, 100 (2d Cir. 1991). The existence of probable cause "is measured as of the time the judicial proceeding is commenced," rather than the time of arrest. *Morgan v. Nassau Cty.*, No. 03-CV-5109, 2009 (SLT) (WDW), WL 2882823, at *10 (E.D.N.Y. Sept. 2, 2009) (internal quotation marks omitted) (citation omitted). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.'" *Johnson v. Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007) (summary order) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003)).

As with false arrest claims, an officer is entitled to qualified immunity for malicious prosecution under § 1983 if he can establish that there was at least arguable probable cause to prosecute the plaintiff. *Barcomb v. Sabo*, 487 F. App'x 645, 647 (2d Cir. 2012) (summary order) (citations omitted). Arguable probable cause exists if "officers of reasonable competence could disagree on whether the probable cause test was met." *Dufort*, 874 F.3d at 354. The Second Circuit has held that in qualified immunity cases, "when the factual record is not in serious dispute . . . the ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Rae v. Cty. of Suffolk*, 693 F. Supp. 2d 217, 225 (E.D.N.Y. 2010) (quoting *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995)). While "[d]isputes over reasonableness are usually fact questions for juries," in the context of qualified immunity, "we are not concerned with the correctness of the defendants'

conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Id*. (citation omitted).

First, Kahn and Uzzell had reasonable cause to prosecute Knox for the alleged violation of his curfew. They did not discover any intervening facts between the time of Knox's arrest and the filing of charges that would diminish the initial finding of reasonable cause. *See Johnson*, 221 F. App'x 48 at 51 (where plaintiff "put[] forth no evidence as to how the probable cause that supported his arrests had dissipated," his malicious prosecution claim failed).

However, the analysis is less straightforward for the domestic violence allegations. When Khan and Uzzell reviewed the Chrono, that record indicated that a woman named Lola Zanzibar called the parole office and stated that Knox threatened to harm or kill her on multiple occasions, that Knox stalked her, and that she had reason to believe he beat his current girlfriend. (Chrono at 5, 8.) Viewing the evidence in the light most favorable to Knox, the Chrono is devoid of specific details to corroborate Zanzibar's account, as she never visited the office to present the alleged text messages or records of phone calls. Knox maintains that he does not know Lola Zanzibar. (Knox Decl. ¶ 7.) The officers did not attempt to visit Knox's girlfriend at her address before arresting Knox, despite the fact that she shares the same phone number as Zanzibar. After charges were filed against Knox, the complainant retracted her initial allegations. (Knox Decl. ¶ 16.)

Although the parties may have different perspectives on the veracity of the domestic violence complaint, the material facts are undisputed as to the events that occurred once Kahn and Uzzell assumed supervision of Knox, and the information they had at the time of the arrest and at the time they filed charges. Even viewing these facts in the light most favorable to Knox,

Kahn and Uzzell avoid liability under the qualified immunity doctrine because officers of reasonable competence could disagree on whether they had probable cause.

The lack of first-hand interaction between defendants and the domestic violence complainant does not preclude the existence of probable cause. Law enforcement officers may rely on allegations supplied by other officers in determining probable cause. *Panetta*, 460 F.3d at 395. "It is well-established that a law enforcement official" may have probable cause to arrest even "if he received his information" from another person, "unless the circumstances raise doubt as to the person's veracity." *Id*. One competent officer might find that the complainant's unwillingness to visit the parole office, coupled with the absence of any documents or physical evidence, raise doubts about the veracity of the complaint. However, another competent officer might characterize the complainant's absence as the typical response of a fearful domestic violence victim. It is not uncommon for victims to make allegations and then refuse to give a statement, or to use fictitious names. (*See* Browne Dep., Ex. D to Campbell Decl. at 30–31; Uzzell Decl. ¶ 13.) Further, while it is arguable that Kahn and Uzzell should have conducted a more extensive investigation, such as attempting to locate Knox's girlfriend, the officers had a reasonable case to effectuate arrest without further inquiry. Officer Uzzell stated that he believed "this woman was in fear for her life" and that she was "scared of [Knox] and what he was capable of." (Uzzell Dep. at 6.) She alleged serious allegations of threats and stalking, in addition to suggesting that Knox's current girlfriend could be in physical danger. Competent officers could disagree on whether it was reasonable for Kahn and Uzzell to accept the putative victim's account as credible, and determine that Knox should be taken into custody without delay.

This case is similar to *Rae v. County of Suffolk*, which addressed defendant police officers' alleged lack of investigation into their colleague's rape allegations against her husband prior to arresting him. 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010). In that case, defendants were not required to question the victim's story, who appeared scared for her life, signed a statement, and showed signs of bruising. *Id.* at 227. While additional indicia of criminal activity existed in that case, the same conclusion applies with equal force here: "the probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or a witness where none are apparent." *Id.* at 224 (internal quotation marks omitted) (citation omitted). The retraction of the domestic violence complaint does not affect the Court's analysis. To determine whether probable cause exists, courts "consider those facts *available to the officer* at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta*, 460 F.3d at 395 (emphasis in original) (internal quotation marks omitted) (citations omitted); *see also Jaegly*, 439 F.3d at 154 (whether or not probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest" (internal quotation marks omitted) (citation omitted)). Here, the retraction occurred on December 2, 2013, five days after the Violation of Release Report was filed, and thus, it does not impact the reasonableness of Kahn and Uzzell's decision to file charges. It cannot be said that at the time the charges were filed, an "objectively reasonable person would have known that they were violating [plaintiff's] rights." *Alvarado*, 482 F. Supp. 2d at 338. In fact, New York regulations *require* parole officers to report a violation of parole. *See* 9 N.Y.C.R.R. § 8004.2(a). Moreover, a retraction of a domestic violence complaint does not necessarily amount to exculpatory evidence; it could easily be driven by fear. *See Felix v. New York State Dep't of Corr. & Cmty. Supervision*, No. 16-CV-7978 (CS), 2018 WL 3542859, at

*10 (S.D.N.Y. July 23, 2018) (defendant entitled to qualified immunity because "[p]arole officers of reasonable competence would not agree that a domestic violence victim's recantation nullified reasonable cause").

Courts do not "insist upon a collateral investigation into the credibility" of victims, as this would impose "an unfair burden on law enforcement officers." *McDermott v. City of New York*, No. 94-CV-2145 (ILG), 1995 WL 347041, at *4 (E.D.N.Y. May 30, 1995). "[W]hile it is possible that the [defendants] could have conducted a more thorough inquiry, they were not required to, and the facts, even taken in the light most favorable to Plaintiff, fail to establish that a reasonable person would have done so." *Rae*, 693 F. Supp. 2d at 227. Given that competent officers could disagree as to the existence of probable cause here, Kahn and Uzzell had arguable probable cause to prosecute Knox for the domestic violence charge, and thus they are entitled to qualified immunity.

## III. Remaining Claims

As this Court finds that Kahn and Uzzell are entitled to summary judgment on the predicate claims of false arrest and malicious prosecution, Knox's assertion of failure to intervene and individual supervisory liability must also fail. *See Tompkins v. City of New York*, 50 F. Supp. 3d 426, 434 (S.D.N.Y. 2014) ("[P]laintiff has no failure-to-intervene or supervisory-liability claim unless he establishes a subordinate officer violated his constitutional rights."); *Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability." (internal quotation marks omitted) (citation omitted)).

**CONCLUSION**

For the foregoing reasons, Kahn and Uzzell's motion for summary judgment is granted, and the complaint is dismissed. The Clerk of the Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        March 1, 2019

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge